**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ASSOCIAÇÃO BRASILEIRA DE MEDICINA DE GRUPO d/b/a ABRAMGE, ) ) ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. _____ |
| ) | |
| BOSTON SCIENTIFIC CORPORATION, ARTHREX, INC. AND ZIMMER BIOMET HOLDINGS, INC. ) ) ) | **JURY TRIAL DEMANDED** |
| ) | |
| Defendants. ) | |

**COMPLAINT**

Plaintiff ASSOCIAÇÃO BRASILEIRA DE MEDICINA DE GRUPO d/b/a ABRAMGE ("Abramge" or "Plaintiff"), by and through its undersigned counsel, for its Complaint against Defendants BOSTON SCIENTIFIC CORPORATION, ARTHREX, INC. AND ZIMMER BIOMET HOLDINGS, INC. (collectively, the "Defendants"), hereby states as follows:

**I.      PARTIES**

1.      Plaintiff ASSOCIAÇÃO BRASILEIRA DE MEDICINA DE GRUPO d/b/a ABRAMGE is a Brazilian not-for-profit organization established under the laws of Brazil, with its principal place of business at Rua 13 de Maio, 1540 Bela Vista, São Paulo, Brazil 01327-002.

2.      Abramge is an association comprised of private group medical service providers, which are entities who provide health insurance in Brazil, that represents and promotes the interests of those private group medical service providers.  Abramge's purpose is to promote and advocate for managed care insurance and similar activities, including representing its members' common interest as a professional association, in court and before public authorities. The

Brazilian health insurance providers listed on Exhibit A to this Complaint are members of Abramge (collectively the "Members").

3.      Under Brazilian law, Abramge has the authority to represent its members' interests as a professional association before public authorities, including in Brazilian federal, state and municipal proceedings, as well as in foreign jurisdictions.  This authority includes Abramge being empowered to commence litigation and bring claims to defend its members' professional and business interests in this action.  Abramge is bringing all counts in this action on behalf of its Members in its capacity as a civil association under Brazilian law, and the count for injunctive relief both on behalf of its Members and in its own capacity as an association.

4.      Abramge is also the assignee of the claims of, and attorney-in-fact for many of its Members for the purposes of collecting compensation from Defendants and other medical device companies resulting from this and related actions. The Brazilian health insurance providers listed on Exhibit B to this Complaint have irrevocably assigned all of their rights, titles and interests in claims, demands, and causes of action for said compensation to Abramge.

5.      Defendant Boston Scientific Corporation ("Boston Scientific") is a Delaware corporation with its principal place of business in Massachusetts. Boston Scientific manufactures a vast array of products used in a range of interventional medical specialties, including interventional radiology, interventional cardiology, peripheral interventions, neuromodulation, neurovascular intervention, electrophysiology, cardiac surgery, vascular surgery, endoscopy, oncology, urology and gynecology. Boston Scientific is a known for its stents, implantable cardioverter defibrillators, pacemakers, stents and spinal cord stimulator systems.

6.      Defendant Arthrex, Inc. ("Arthrex") is a Delaware corporation with its principal place of business in Florida. Arthrex manufactures implants for sports medicine and joint

prosthetics. Arthrex also develops and manufactures orthobiologics, which are substances many orthopaedic surgeons use to assist in the healing process of injuries.

7.      Defendant Zimmer Biomet Holdings, Inc. ("Zimmer Biomet") is a Delaware corporation with its principal place of business in Indiana. Zimmer Biomet manufactures and markets orthopedic products, including knee, hip, shoulder, elbow, foot and ankle artificial joints and dental prostheses.


## II.      JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) and the amount in controversy well exceeds the sum of $75,000.00, exclusive of interest and costs.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because the Defendants are entities organized and existing under the laws of the State of Delaware.

## III.      FACTUAL ALLEGATIONS

10.      This action arises from Defendants' individual illicit schemes, which were planned in and run from the United States, designed to increase their market share in Brazil by making improper payments and paying bribes and kickbacks to Brazilian doctors to induce the use of Defendants' products, regardless of the need for or cost of such products.  These schemes resulted in Brazilian health insurers such as the Members being forced to pay millions of dollars beyond what those insurers should have been required to pay for procedures which implanted devices, or used products, manufactured and sold by Defendants.

11.      Under the Brazilian health insurance system, health insurance companies pay for medical devices implanted in their insureds either by directly paying the device supplier (generally a Brazilian subsidiary of the device manufacturer or a Brazilian distributor) or by

paying the hospitals that implant the medical devices, who in turn pay the distributors or subsidiaries.

12.     It is standard practice in Brazil that health insurers are obligated to pay for medical devices implanted in their insureds. Government regulation and insurance contracts require either direct payment for the device to the device manufacturer (or its distributor or subsidiary), or reimbursement to the medical providers who purchase the devices from the manufacturer and then implant the devices.

13.     In short, Defendants knew a device implanted in an individual who had private health insurance in Brazil was going to be paid for by a Brazilian health insurer, including the insurance companies that make up Abramge.

14.     It has recently been discovered that, from at least 2006 to the present, Defendants, their Brazil-based wholly-owned subsidiaries, and in some cases local Brazilian medical device distributors acting as Defendants' agents, made improper payments and paid kickbacks to Brazilian doctors with the intent of influencing those doctors to use Defendants' devices and products in patients even if those devices were not called for or did not best meet the patients' medical needs.

15.     Defendants intended that their improper payments and kickbacks would influence Brazilian doctors to alter those factors they considered in making decisions in treating their patients and induce them to use Defendants' devices and products before all others, even if other devices or products may have been better suited.  Defendants intended that false claims for payment for these devices, products and services obtained through the bribes and kickbacks would be submitted for payment to Brazilian health insurers.

16.     Defendants made the complained of improper payments on a wide-spread and far reaching scale throughout Brazil.

17.     The improper payments and kickbacks Defendants made were part of organized schemes, planned in and run from the United States, to increase Defendants sales in Brazil.

18.     These schemes were conceived, directed, controlled, and coordinated in and from the United States by Defendants' executives and employees.

19.     The doctors who were the recipients of Defendants' improper payments and kickbacks did indeed respond to those bribes, and used Defendants' devices and products in patients even when those devices were not called for and did not best meet the patients' needs.

20.     The sale of Defendants' devices and products increased in Brazil as a result of the improper payments and kickbacks Defendants paid.

21.     Brazilian health insurers suffered significant damages as a result of Defendants' scheme and the inflated claims for reimbursement that flowed from that scheme.

22.     Brazilian health insurers were forced to pay for Defendants' devices and products that were improperly implanted into or used in their insureds.  Sometimes, these devices and products were implanted or used when none were necessary.  Indeed, doctors sometimes performed completely unnecessary surgeries in order to use Defendants' products.  Other times, multiple devices and products were implanted or used when fewer would have sufficed. Still other times, Defendants' devices and products were implanted or used when cheaper alternatives would have been equally or more efficacious.

23.     Brazilian health insurers were also forced to pay for Defendants' devices and products at inflated prices. In order to induce doctors to use Defendants' devices and products, Defendants would invoice devices and products to doctors at prices that exceeded what those

devices and products should have cost. This allowed Defendants to recoup the cost of the illicit payments made to doctors from the Brazilian health insurers that comprise Abramge, essentially forcing those companies to finance Defendants' scheme.

24.     Neither Abramge nor the Brazilian health insurance provider Members knew of the improper payments or kickbacks to various Brazilian doctors that Defendants were making to influence those medical professionals' use of Defendants' devices and products.

25.     The inflated and unnecessary amounts the Members were obligated to pay as a result of Defendants' scheme run to millions of dollars.

26.     Defendants knew or should have known, and in fact intended, that these fraudulent improper payments would induce Brazilian medical providers to (1) buy medically unnecessary amounts of Defendants' devices; (2) conduct unnecessary medical procedures, in order to use more of Defendants' products; and (3) overbill insurers for Defendants' products and medical procedures.

27.     This scheme not only caused and continues to cause significant losses to insurers and the Brazilian public health system, but also has resulted in injury to patients throughout the country.

28.     Defendants profited from their scheme to conceal and Plaintiff's resulting ignorance of Defendants' improper payments and they thereby succeeded in exacting millions of dollars in overpayments from Brazilian health insurance company Members as a result.

## THE BRAZILIAN HEALTH INSURANCE SYSTEM

29.     Brazil has the second-largest private health insurance market by population in the world after the United States.

30.     That market is complimentary to Brazil's publicly funded health system, the Sistema Único de Saúde ("SUS"). The SUS is a universal system of healthcare that is entirely free of any cost for any person.

31.     The SUS is a fundamental structure of the healthcare system in Brazil and serves about 75% of the Brazilian population. Nevertheless, as a result of income growth and the expansion of the labor market in Brazil more and more Brazilians have chosen to purchase private insurance, which includes coverage from medical service providers such as the members of Abramge.

32.     This is because the services provided by private insurance plans are understood to provide supplemental and increased benefits to the benefits provided by the SUS.

33.     The numbers of Brazilians participating in the Brazilian private insurance market generally continues to increase.

34.     Recently, private health insurance spending in Brazil has surpassed the amount of money spent each year by the SUS.

35.     In order to ensure that the goal of a certain level of universal healthcare envisioned by the implementation of the SUS is met in Brazil, and that minimum standards of care are met, Brazilian private health insurance is highly standardized and regulated by the Agência Nacional de Saúde ("ANS").

36.     The ANS, which is part of the Brazilian Ministry of Health, has a stated mission to promote public interest in private health insurance by regulating the companies and entities that operate in that industry.

37.     To this end, the ANS imposes quality standards on the coverage health insurers may provide.

38.     The quality standards imposed by the ANS not only require that health insurers provide ample coverage for all pathologies included in the International Classification of Diseases, psychiatric care, kidney and cornea transplants, but also set forth a Minimum Mandatory Coverage List of approximately 5,000 procedures that must be covered by private healthcare insurance plans.

39.     Insurers who do not meet the quality standards for health insurance that ANS sets will be sanctioned by it.

40.     The minimal standard of services set forth by the ANS requires that private health insurers provide coverage for an insured to be admitted to a recognized hospital and pay for the drugs, materials and laboratory services dispensed while the insured is admitted to that hospital, as well as any out-patient services.

41.     Under Brazilian law, an insurer may not restrict the medical treatment offered to one of its insureds. Doctors have control over decisions on appropriate care, but must provide appropriate care within the minimum standards of the Code of Business Conduct of the National Association of Private Hospitals, ANAHP Manual de Conduta Etica, Sec. IV(c), which requires doctors and hospitals to conduct themselves fairly and objectively when selecting medical devices to be used in procedures.

42.     In other words, the ANS's requirements mandate that Brazilian insurers (including the Members) pay for medical devices, which are implanted based solely on a doctor's decision during the hospital stay of one of its insureds.

43.     The vast majority of policies issued by Brazilian health insurers provide coverage for implanted medical devices beyond the minimal standards imposed by ANS.

44.     This enhanced coverage is, in fact, one of the reasons that so many Brazilians are obtaining private health insurance.

45.     Thus, under the Brazilian system of private health insurance, doctors make the decisions about what to implant in their patients and the health insurers are required to pay for those devices that are implanted.

46.     It also means that any improper influence exercised by third parties on how doctors decide what medical devices to implant in a patient who is insured by a private Brazilian health insurer affects that health insurer, which ultimately bears the cost of those decisions.

47.     When that improper influence increases the cost of a medical device that is implanted, or the number of devices implanted, or causes doctors to perform unnecessary surgeries, the insurer bears those additional costs.

48.     Sometimes, private health insurers in Brazil pay the Brazilian distributors or the device manufacturer's subsidiary for medical devices directly. In other cases, however, these insurers pay hospitals for the medical devices that are implanted, and those hospitals in turn pay the device manufacturer (or its Brazilian distributors or subsidiary).

## THE PROSTHETIC MAFIA:
## CORRUPTION IN THE BRAZILIAN MEDICAL DEVICE MARKET

49.     As they do in many parts of the world, medical device manufacturers have been battling over market share in Brazil, seeking to grow their market share as quickly as possible.

50.     Many medical device manufacturers have sought to increase their market share in Brazil by improperly influencing the decisions doctors make about the devices that they implant, to the detriment of the SUS and Brazil's private health insurers.

51.     Recently, the Brazilian press and trade organizations, including the trade organization that represents Brazilian medical device distributors, have reported that medical device distributors in the Brazilian market have promoted the use of their medical devices by paying millions of dollars' worth of improper commissions and other improper financial incentives to physicians and hospitals.

52.     In fact, the president of ABRAIDI, the trade association representing Brazilian medical device distributors, made a public presentation in which he acknowledged that medical device distributors regularly paid commissions ("chocolates, bribes or however you wish to describe them")[1] to physicians and hospitals, and that these commissions resulted in increased prices for medical devices (namely they are "very high to the point of greatly affecting our industry").  These improper commissions and financial incentives are not disclosed to either patients or third-party payers (such as the Members), but rather are concealed to avoid detection.

53.     Paying bribes and kickbacks to medical providers has become standard operating procedure for medical device companies selling products in Brazil.

54.     The extent to which medical device manufacturers were bribing doctors became a matter of public attention and concern in January 2015, when the Brazilian television news

---

[1] "Chocolates" is a term used in Brazil for a bribe.

program *Fantastico* featured a series of reports showing Brazilian medical device distributors offering secret cash commissions to an undercover reporter posing as a Brazilian surgeon.

55.     The reporting done by *Fantastico* is analogous to reporting done by 60 Minutes or 20/20.

56.     *Fantastico*'s reports included undercover testimony from participants in medical device bribery schemes disclosing extensive bribery, kickbacks and fraud in the sale of medical devices.

57.     During the television program, representatives for numerous medical device distributors — including distributors used by Defendants — offered physicians commission payments of 20 to 30 percent if they used certain medical devices.

58.     The *Fantastico* news program helped spur the Brazilian government into action and, immediately following its airing, the National Congress of Brazil conducted hearings to investigate corruption in the Brazilian medical device market.

59.     During Congressional testimony, at least two medical device distributors acknowledged that the distributors provided hospitals with inflated invoices that did not reflect the actual price of the medical devices or discounts the distributors had provided.

60.     Those inflated invoices were provided so that they could be used to overcharge third-party payers, *i.e.*, health insurance providers, thus allowing the doctor that implanted the device to keep the difference between the actual price and the invoiced price.

61.     Similarly, the invoices that medical device manufacturers' distributors and subsidiaries send to third-party payers reflect vast price disparities for the same medical device.

62.     In some cases, a single distributor charged third-party payers different amounts for the same medical device, depending on the amount of the kickback or bribe.  The medical

devices were identical – the only difference was the identity of the doctor (and the commission the doctor received).

63.     In other cases, different distributors charged third party payers vastly different prices for the same medical device.  In certain cases, one distributor charged more than ten times more for a product than another distributor.  The massive difference in the price to the third party payers is clearly the result of the kickback or bribe being paid.

64.     The final report issued by the Brazilian congress found that the improper payments have "grown alarmingly" and that the fraudulent scheme was "endangering the lives of patients in favor of the companies' profit."

65.     The report found that doctors, incentivized by receiving payments from medical device manufacturers like Defendants, were scheduling unnecessary surgeries for patients to implant devices.

66.     This is the exact effect – increasing the purchase and use of their devices – that the medical device manufacturers were hoping for when they embarked on their scheme to bribe doctors.

## THE SECRET PAYMENTS VIOLATE
## ETHICAL CODES AND CRIMINAL LAWS

67.     The medical device industry's payment of improper, secret commissions and financial incentives to physicians to influence those physicians' selection of medical devices, is contrary to applicable state and Federal law, Brazilian local law and Brazilian medical ethics codes.

68.     The Code of Business Conduct of the National Association of Private Hospitals, ANAHP Manual de Conduta Etica, Sec. IV(c), requires doctors and hospitals to conduct themselves fairly and objectively when selecting medical devices to be used in procedures.

69.     Resolution No. 1.956/2010 of the Conselho Federal de Medicina ("CFM"),[2] a Brazilian private association with the power to regulate the medical industry in Brazil, states that physicians may not specify specific brands of medical devices or specific vendors for use in medical procedures.

70.     Nonetheless, because of the improper commissions and financial incentives paid to physicians, physicians often demand a particular device that must be used.

71.     In some cases physicians go so far as to specify the particular distributor who should supply the product.

72.     The improper commissions and financial incentives have also led to physicians resisting efforts by third-party payers to substitute another device or another distributor. Defendants have benefitted from this practice, as Brazilian medical practitioners have resisted efforts by Brazilian insurers to replace Defendants' products with other, cheaper products.

73.     The ethical codes referenced above are not merely suggested guidelines.  The Code of Ethics is reviewed and adopted by the CFM.

74.      The CFM has the authority to discipline doctors for ethical violations, including revoking the medical licenses of doctors who violate the code.

75.     The medical providers and medical device manufacturers and distributors have not merely violated ethical codes; they are also violating the criminal laws of Brazil, the United States, and the civil laws of the United States and the State of Delaware.

---

[2] In English: the Federal Council of Medicine.

76.     The Brazilian Federal Police have launched investigations into the medical device industry. Prosecutors and investigators have obtained and executed warrants to search the homes and businesses of major medical device distributors and medical professionals.

77.     These investigations are directed at the medical device industry's payment of improper, secret commissions and financial incentives to medical professionals to induce those professionals to implant a particular manufacturer's medical devices.

78.     The Brazilian press and Federal Police have referred to these targets, and the others involved in this corruption, as the "Prosthetic Mafia."

79.     The charging documents in these investigations reveal that the Brazilian authorities indicted the distributors and doctors with violations of the Brazilian Penal Code, including, among other things, a section prohibiting the formation and operation of criminal associations.

80.     These same charging documents show that the Brazilian authorities point to other serious violations of Brazilian criminal law, including, *inter alia*,: committing grave bodily injury, larceny, fraud, perjury, bribery, the illegal removal or harm to bodily tissues and coercing others to commit crimes.

81.     Certain individuals involved in these schemes have begun to seek and accept plea deals.

82.     Once the medical device industry's payment of improper, secret commissions and financial incentives to physicians came to light, price disparities diminished, and the number of procedures to install medical devices was reduced, at least temporarily.

83.     A prominent São Paulo hospital studied the difference in certain medical procedures before and after the public disclosure of the medical device scandal and found a 30% reduction in those procedures.

84.     This reduction is telling: the 30% reduction in the number of procedures measures the unnecessary procedures that were done because of the medical device industry's improperly influencing Brazilian doctor's decisions. Those unnecessary procedures were paid for, in part, by the Brazilian insurance industry, including the Members.

85.     The improper, secret commissions and financial incentives paid by the medical device manufacturers caused significant harm in the Brazilian private health insurance market, including: (1) increased cost of medical devices to third-party payers, like the Members, by diverting the market to other products; (2) inducing physicians to perform unnecessary medical procedures and use unnecessary medical devices; (3) inducing physicians to order and implant/use unnecessary medical devices, even in required medical procedures; and (4) causing unnecessary pain and suffering, injury and death to patients.

## BOSTON SCIENTIFIC'S SCHEME
## TO DEFRAUD THE BRAZILIAN MEDICAL DEVICE MARKET

86.     Boston Scientific was a willing participant in the fraud that medical device manufacturers perpetrated on the Brazilian medical device market and Brazilian private health insurers.

87.     Boston Scientific is a part of the Prosthetic Mafia.

88.     Boston Scientific defrauded Brazilian health insurance companies, including the Members, by bribing Brazilian medical professionals, who in turn (a) ordered unnecessary Boston Scientific products, (b) subjected patients to unnecessary surgeries, in which to use the

Boston Scientific products and (c) billed all of these unnecessary costs to health insurance companies.

89.     Boston Scientific directly sold their products in Brazil and indirectly through their Brazilian subsidiary Boston Scientific do Brasil Ltda. and other local Brazilian distributors.

90.     Boston Scientific do Brasil, based in São Paulo, also directly and indirectly sold Boston Scientific products to hospitals and doctors in Brazil.

91.     Many sales of Boston Scientific products in Brazil were made by or through Boston Scientific do Brasil or other local Brazilian medical device distributors. Boston Scientific perpetrated the complained of fraud in Brazil through their control of, use and direction of Boston Scientific do Brasil and various local Brazilian distributors. Specifically, local distributors engaged by Boston Scientific to sell Boston Scientific products paid kickbacks and other secret financial inducements to Brazilian medical providers.

92.     Upon information and belief, Boston Scientific and the local distributors fraudulently concealed these kickbacks and secret payments and did not record such payments in their books and records.

93.     Upon information and belief, at the end of Boston Scientific's fiscal year, their employees, agents, representatives, distributors, contractors, subsidiaries and/or affiliates falsely recorded the payments to conceal the true nature of the payments in the consolidated books and records of Boston Scientific, which consolidated books and records were then used for purposes of preparing the Boston Scientific's year-end financial statements, and which were then filed with the U.S. Securities and Exchange Commission ("SEC") in violation of U.S. law.

94.     The Brazilian medical providers accepted kickbacks and other secret gifts, in exchange for purchasing unnecessary Boston Scientific products at artificially high prices.

95.     Boston Scientific also built the bribes they paid to Brazilian doctors into the prices of medical devices, resulting in overpricing across the board.

96.     Boston Scientific paid these bribes to increase sales volume, create market share and establish market dominance.

97.     All of this was confirmed by an investigation undertaken by the Brazilian Federal Police in the city of Montes Claros, in the Brazilian state of Minas Gerais.

98.     That investigation resulted in police raids on the offices of Signus do Brasil Comercio de Materials Hospitalares Ltda. ("Signus"), a distributor that Brazilian police linked to Boston Scientific.  The police detained suspects, who then cooperated with the authorities.

99.     The Brazilian Federal Police are investigating certain Boston Scientific do Brasil and Signus executives for corruption and creating false documents to facilitate a scheme that Brazilian prosecutors have described as "transnational," which highlights that Boston Scientific was controlling Boston Scientific do Brasil's and Signus' actions.

100.    Many aspects of Boston Scientific's scheme of improper payments were quite simple.

101.    Sales representatives working on behalf of Boston Scientific, or on behalf of Boston Scientific's Brazilian distributors at the direction of Boston Scientific, would approach doctors and offer to pay a fee for every Boston Scientific device or product that doctor used. For example, they would offer to pay a doctor from R$500 to R$2,000 (approximately $300 to $1,200 at the then-current exchange rate) for every stent he ordered.

102.    These representatives working on behalf of Boston Scientific would meet with a particular doctor to sign them to "consultancy" agreements, which formalized and sought to legitimize the bribery.

103.    An example of the type of dealings Boston Scientific and Signus would engage in to facilitate their scheme is Angiomoc Servicos Medicos Ltda. ("Angiomoc").

104.    Employees of Signus, on behalf of Boston Scientific, approached three doctors in 2006 and suggested paying those doctors kickbacks in proportion to the monthly amount of Boston Scientific products they ordered, in both public and private healthcare settings.

105.    Signus offered to pay the doctors kickbacks of between 20 to 40% of the total Boston Scientific products they used.

106.    To facilitate the payments the doctors were going to receive, and keep those payments hidden, the doctors created a phony medical group called Angiomoc.  Angiomoc was a legal fiction created by the three doctors to receive illegal payments from medical device manufacturers and distributors and to then funnel those proceeds to the doctors.

107.    Signus, on behalf of Boston Scientific, made payments to Angiomoc corresponding to a percentage of the total cost of the Boston Scientific products the three doctors ordered.

108.    At the beginning of the scheme, Signus representatives paid the three doctors directly for their use of Boston Scientific products.

109.    In 2012, Signus ceased paying the three doctors directly and instead signed contracts with Angiomoc.  Signus paid Angiomoc R$45,000 (approximately $27,000) a month provided that the three doctors who formed Angiomoc continued to use Boston Scientific products.

110.    In 2014, Signus representatives informed the doctors that Signus was running into financial troubles and that payments would be below the R$45,000 per month previously agreed upon, but would once again be made directly into the doctors' personal bank accounts.

111.   Angiomoc invoiced Signus by passing spreadsheets on to Signus representatives which reflected the doctors' use of Boston Scientific products, so that the Signus could tell how much to pay the doctors.

112.   After each monthly spreadsheet was circulated, one of the doctors would issue an invoice from Angiomoc to Signus, seeking payment for "consultancy"; the amounts of these monthly "consultancy" invoices corresponded exactly to certain percentages of the total sales exhibited on the spreadsheets.

113.   For example, over just the 6 month span from June 2012 to December 2012, Signus paid Angiomoc over R$315,000.00 (approximately $189,000) in kickbacks.

114.   Boston Scientific's kickbacks to local doctors and medical providers induced the following actions:

      a.      Led to unnecessary indications for surgery, where more conservative treatment was sufficient;

      b.      Exaggeration of the severity of injuries;

      c.      Use of unnecessary amounts of Boston Scientific devices;

      d.      Falsification of medical reports; and

      e.      Use of expired or damaged medical devices.

115.   Medical providers, in order to receive the kickbacks and other secret and improper financial benefits, would choose Boston Scientific products even though other companies' medical devices might be better for the patient and/or lower in price while providing the same or a superior benefit to the patient.

116.   This is precisely what the bribes were meant to achieve: increase Boston Scientific's sales by getting doctors to use their products more often.

117.    Boston Scientific knew that "someone" was going to pay for the increased use of their products and that the payers were going to be the insurers.

118.    If the patient was an insured of one of the Members, Boston Scientific knew the costs of these unnecessary surgeries and superfluous medical devices would be borne by the Members.

119.    In total, Boston Scientific, through direct payments to Brazilian doctors, as well as payments made by Signus and other local distributors, generated millions of dollars of net profits.

120.    Boston Scientific's behavior in Brazil is part and parcel of the way it does business.

121.    In 2009, Boston Scientific agreed to pay $22 million to settle allegations brought by the Department of Justice ("DOJ") that one of its divisions paid kickbacks to doctors to participate in post-market studies, in order to boost sales of Boston Scientific pacemakers and defibrillators.

122.    In 2011, two former employees of Boston Scientific commenced a lawsuit in the District of New Jersey alleging, *inter alia*, that Boston Scientific paid kickbacks to doctors to encourage use of Boston Scientific's spine products.  The complaint survived Boston Scientific's motion to dismiss.

123.    That suit is still pending.

124.    Both of these instances are strikingly similar to what Plaintiff has discovered Boston Scientific has been doing in Brazil.

## ARTHREX'S SCHEME
## TO DEFRAUD THE BRAZILIAN MEDICAL DEVICE MARKET

125.    Arthrex is a willing participant in the fraud that medical device manufacturers perpetrated on the Brazilian medical device market and Brazilian private health insurers.

126.    As such, Arthrex is a part of the Prosthetic Mafia.

127.    Arthrex defrauded Brazilian health insurance companies, including the Members, by bribing Brazilian medical professionals, who in turn (a) ordered unnecessary Arthrex products, (b) subjected patients to unnecessary surgeries, in which to use the Arthrex products and (c) billed all of these unnecessary costs to health insurance companies.

128.    On most occasions, bribe amounts ranged from 20 to 40 percent of the sales, depending on the doctor who prescribed and used the Arthrex products.

129.    Arthrex sold their products in Brazil directly and through local Brazilian distributors.

130.    Arthrex sold some of their products in Brazil through its Brazilian subsidiary, Arthrex do Brasil.

131.    Many sales of Arthrex products in Brazil were made by or through local Brazilian medical device distributors.

132.    Arthrex perpetrated the complained of fraud in Brazil through their control of, use and direction of those various local Brazilian distributors. Specifically, local distributors engaged and/or controlled by Arthrex paid kickbacks and other secret financial inducements to Brazilian medical providers.

133.    The chief distributor in Brazil that Arthrex used during the relevant times is Tellus River Trade and Import and Export Ltda. ("Tellus").

134.     In its final report, the Brazilian Parliamentary Inquiry Commission of Prosthetics and Orthotics Mafia, which was convened by the Brazilian Congress, referred Tellus to Brazilian prosecutors for investigation and possible prosecution because its preliminary investigation of Tellus showed that Tellus had engaged in widespread bribery of Brazilian doctors on its principals' behalves in order to increase the sale of those principals' medical devices.

135.     One of those principals is Arthrex.

136.     Upon information and belief, Arthrex, Arthrex do Brasil and the local distributors fraudulently concealed these kickbacks and secret payments and did not record such payments in their books and records.

137.     The Brazilian medical providers accepted kickbacks and other secret gifts, in exchange for purchasing unnecessary Arthrex products at artificially high prices.

138.     The Brazilian medical providers billed third-party payers, including the Members, for these unnecessary medical devices and medical procedures, which were the product of fraud.

139.     This fraud was pervasive within Arthrex, involved millions of dollars, and involved a significant part of Arthrex's business.

140.     Arthrex exercised complete control over Arthrex do Brasil, including but not limited to its sales and financial policies

141.     In some instances, Arthrex do Brasil would not directly sell Arthrex products, but would instead engage local distributors to sell to doctors and hospitals.

142.     Arthrex do Brasil controlled those distributors' actions as well.

143.     Arthrex perpetrated the complained of fraud in Brazil through its control of their local Brazilian distributors.

144.    Arthrex senior executives conceived, directed and controlled this fraudulent scheme in and from the United States.

145.    The bribes and kickbacks that Arthrex paid created improper incentives for the Brazilian doctors and hospitals who were receiving them, as they were intended to.

146.    Specifically, doctors and hospitals looking to profit from Arthrex's illicit payments would either overuse Arthrex medical devices in surgical procedures or engage in unnecessary operations in order to use more Arthrex products.

147.    In certain cases where a patient required the implantation of a single device, doctors receiving bribes would unnecessarily implant extra and unnecessary Arthrex devices, which would allow the doctor or hospital to order more Arthrex devices and receive more kickbacks.

148.    Similarly, in some cases where patients might not require a device, doctors receiving bribes would unnecessarily implant a device.  Again, this allowed the doctor or hospital to order more medical devices and receive more bribes.

149.    Medical providers, in order to receive the kickbacks and other secret financial benefits, would choose Arthrex products even though other companies' medical devices might be better for the patient and/or were lower in price while providing the same or a superior benefit to the patient.

150.    This is precisely what the bribes were meant to achieve: increase Arthrex's sales by getting doctors and hospitals to use their products more often.

151.    Arthrex knew that someone was going to pay for the increased use of their products and that the payers were going to be the insurers.

152.    If the patient was an insured of one of the Members, Arthrex knew the costs of these unnecessary surgeries and superfluous medical devices would be borne by the Members.

153.    In total, Arthrex, through direct payments, payments made by Arthrex do Brasil and through local distributors generated millions of dollars.

## ZIMMER BIOMET'S SCHEME
## TO DEFRAUD THE BRAZILIAN MEDICAL DEVICE MARKET

154.    Zimmer Biomet is also a part of the Prosthetic Mafia.

155.    Zimmer Biomet defrauded Brazilian health insurance companies, including the Members, by bribing Brazilian medical professionals, who in turn (a) ordered unnecessary Zimmer Biomet products, (b) subjected patients to unnecessary surgeries, in which they used Zimmer Biomet products and (c) billed all of these unnecessary costs to health insurance companies.

156.    On most occasions, bribe amounts ranged from 20 to 40 percent of the sales, depending on the doctor who prescribed and used the Zimmer Biomet products.

157.    Zimmer Biomet directly sold their products in Brazil and through local Brazilian distributors.

158.    Many sales of Zimmer Biomet products in Brazil were made by or through local Brazilian medical device distributors. Zimmer Biomet perpetrated the complained of fraud in Brazil through their control of, use and direction of those various local Brazilian distributors. Specifically, local distributors engaged by Zimmer Biomet to sell Zimmer Biomet products paid kickbacks and other secret financial inducements to Brazilian medical providers.

159.    Upon information and belief, Zimmer Biomet and the local distributors fraudulently concealed these kickbacks and secret payments and did not record such payments in their books and records.

160.    Upon information and belief, at the end of Zimmer Biomet's fiscal year, their employees, agents, representatives, distributors, contractors, subsidiaries and/or affiliates falsely recorded the payments to conceal the true nature of the payments in the consolidated books and records of Zimmer Biomet, which consolidated books and records were then used for purposes of preparing Zimmer Biomet's year-end financial statements, and which were then filed with the U.S. Securities and Exchange Commission in violation of U.S. law.

161.    The Brazilian medical providers accepted kickbacks and other secret gifts, in exchange for purchasing unnecessary Zimmer Biomet products at artificially high prices.

162.    The Brazilian medical providers billed third-party payers, including the Members, for these unnecessary medical devices and medical procedures, which were the product of fraud.

163.    This fraud was pervasive within Zimmer Biomet, involved millions of dollars, and involved a significant part of Zimmer Biomet's business.

164.    Zimmer Biomet perpetrated the complained of fraud in Brazil through its control of their local Brazilian distributors.

165.    Zimmer Biomet senior executives conceived, directed and controlled this fraudulent scheme in and from the United States.

166.    The bribes and kickbacks that Zimmer Biomet paid created improper incentives for the Brazilian doctors and hospitals who were receiving them, as they were intended to.

167.    Specifically, doctors and hospitals looking to profit from Zimmer Biomet's illicit payments would either overuse Zimmer Biomet medical devices in surgical procedures or engage in unnecessary operations in order to use more Zimmer Biomet products.

168.    In certain cases where a patient required the implantation of a single device, doctors receiving bribes would unnecessarily implant extra and unnecessary Zimmer Biomet devices, which would allow the doctor or hospital to order more Zimmer Biomet devices and receive more kickbacks.

169.    Similarly, in some cases where patients might not require a device, doctors receiving bribes would unnecessarily implant a device.   Again, this allowed the doctor or hospital to order more medical devices and receive more bribes.

170.    Medical providers, in order to receive the kickbacks and other secret financial benefits, would choose Zimmer Biomet products even though other companies' medical devices might be better for the patient and/or were lower in price while providing the same or a superior benefit to the patient.

171.    This is precisely what the bribes were meant to achieve: increase Zimmer Biomet's sales by getting doctors and hospitals to use their products more often.

172.    Zimmer Biomet knew that someone was going to pay for the increased use of their products and that the payers were going to be the insurers.

173.    If the patient was an insured of one of the Members, Zimmer Biomet knew the costs of these unnecessary surgeries and superfluous medical devices would be borne by the Members.

174.    In total, Zimmer Biomet through direct payments, and payments made by and through local distributors, generated millions of dollars.

175. Zimmer Biomet's activities in Brazil follow their standard business practice and fit their pattern of doing business.

176. Biomet, Inc. ("Biomet"), prior to its merger with Zimmer, and Zimmer Biomet have been investigated by the United States for improprieties in the past relating to their sales practices in Brazil and other countries (particularly the bribery of doctors employed by the Brazilian government to ensure the use of Zimmer Biomet products).

177. In fact, on March 26, 2012, Biomet entered into a Deferred Prosecution Agreement ("DPA") with the DOJ and a Consent to Final Judgment with the U.S. Securities and Exchange Commission ("SEC") to end an investigation by the DOJ and the SEC into Biomet's violations of the Foreign Corrupt Practices Act. Biomet was bribing doctors in Brazil, who were employed by the SUS, as part of its marketing and sales strategy in that country.

178. Pursuant to the terms of the DPA, the government agreed to defer prosecution of Biomet so long as it adhered to certain guidelines.

179. The obligations of the DPA were ongoing.

180. Zimmer Biomet breached that agreement and on April 15, 2016, the United States' government notified Zimmer Biomet that the government had determined that Zimmer Biomet had breached the DPA based on its continuing conduct in Brazil.

181. Subsequently, Zimmer Biomet and the United States' government announced (on December 8, 2016) that they expect to reach a settlement regarding the United States' government's latest bribery allegations against Zimmer Biomet.

182. The new agreement would replace Zimmer Biomet's previous settlement with the U.S. Justice Department over allegations that Biomet paid bribes to state-employed healthcare providers in Brazil and other countries in order to win business.

183.    As such, the conduct that Plaintiff is complaining about in Brazil – though qualitatively different in that Zimmer Biomet had been investigated for bribing doctors employed in Brazil by the Brazilian government, not private doctors – is par for the course for Zimmer Biomet.

184.    Even in the United States the Defendants have conducted their operations in violation of law and been subject to DOJ investigations for paying kickbacks to doctors.

185.    In 2007 the DOJ filed criminal complaints against Zimmer Biomet and Biomet for violations of the anti-kickback statute.

186.    The DOJ complaint alleged that Zimmer Biomet and Biomet had bribed surgeons with lucrative consulting agreements as inducements to use Zimmer Biomet's and Biomet's artificial knee and hip reconstruction and replacement products.

187.    These suits demonstrate the pattern of the Zimmer Biomet's behavior and its predisposition to engage in abusive and illegal business practices: it pays kickbacks and makes other improper payments to doctors to induce those doctors to use its devices and to increase its market share.

188.    Zimmer Biomet has followed this same business model and engaged in this same pattern of illegal behavior to increase its market share in Brazil.

## DEFENDANTS FRAUDULENTLY CONCEALED
## THEIR SCHEMES TO DEFRAUD

189.    Defendants intentionally concealed the kickbacks and other secret financial payments to mislead Brazilian health insurers, including the Members, into relying upon the veracity of medical bills and invoices presented to them for payment.

190.    Defendants were aware that the Plaintiff and the Members did not know of the secret payments and intended that the payments remained secret.

191.    Defendants intended that the Members not be aware of the secret payments Defendants were making.

192.    Given the secret nature of the kickback and bribery scheme effectuated through false invoices that Defendants put in place and concealed from the Plaintiff and the Members, Plaintiff and the Members did not know and could not have discovered the scheme through the exercise of reasonable diligence.  It was not until the Brazilian media and government uncovered the extent of the bribery that Plaintiff and the Members were made aware of the extent and scope of the fraudulent scheme alleged herein.

## CLAIMS FOR RELIEF

### Count I
### Fraud By Non-Disclosure and Active Concealment

193.    Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

194.    Defendants intentionally and actively concealed the fact that they engaged in a widespread campaign of making secret payments to doctors in Brazil to induce those doctors to use Defendants' medical devices.

195.    Defendants intentionally and actively concealed the fact that, directly and through their wholly-owned subsidiaries and their Brazilian distributors, they offered Brazilian medical professionals bribes and secret payments, which were intended to influence Brazilian doctors in order to retain their business.

196.     Defendants' payment, directly and through their wholly-owned subsidiaries and their Brazilian distributors, of improper, secret commissions and financial incentives to physicians to influence those physicians' selection of medical devices, is contrary to applicable state and Federal law, Brazilian local law and Brazilian medical ethics codes.

197.     Under those ethical codes and laws, Defendants had a duty not to bribe Brazilian doctors and hospitals.

198.     Defendants had a duty to abide by the legal and ethical requirements of the Brazilian medical device market.

199.     Defendants had a duty to disclose any payments or inducements that they provided to Brazilian doctors to the patients of the corrupted doctors and to the Members, who were known by Defendants to be the insurers responsible for paying the false claims for the medical devices, procedures and surgeries Defendants created and had submitted for patients' care.

200.     Defendants were aware of the secret financial payments they were making, directly and through their wholly-owned subsidiaries and their Brazilian distributors, to Brazilian doctors and hospitals.

201.     Defendants were aware that their scheme of secret payments was unethical and illegal.

202.     Defendants knowingly and intentionally misled the Members by failing to disclose that kickbacks and other secret financial payments were made to Brazilian medical providers.

203. Defendants intentionally and actively concealed the kickbacks and other secret financial payments to mislead Brazilian health insurers, including the Members, into relying upon the veracity of medical bills and invoices presented to them for payment.

204. Defendants were aware that the Plaintiff and the Members did not know of the secret payments and intended that the payments remained secret.

205. Indeed, Defendants took active steps to ensure that their conduct remained unknown to the Members.

206. The kickback and bribery scheme that Defendants had put in place was designed to thwart Plaintiff and the Members from discovering the scope of Defendants' conduct, which Plaintiff and Members could not have discovered until the Brazilian media and government uncovered the extent of the bribery.

207. Defendants' scheme of secret payments to Brazilian doctors intended to affect, and actually did affect, the amounts that were billed to the Members and the amounts that the Members were obligated to pay and did pay.

208. For this reason, Defendants' scheme was material to the Members.

209. Defendants' failure to disclose the payment of bribes and other secret financial payments to Brazilian medical providers was further material because the Members relied upon the honest services of those medical providers when presented with invoices to pay for what the Members believed were medically necessary products and procedures.

210. The Members reasonably relied on their belief that the doctors who had been bribed were acting in line with industry standards and ethics and that the invoices they provided only included charges for medically necessary products/surgeries and charged the actual amount for the devices implanted, and that those invoices were not the product of secret payments.

211.    Defendants' unlawful conduct has directly, legally and proximately caused and continues to cause injuries to the Members and their business or property.

212.    These injuries include the Members paying excessively high prices for devices and procedures, and for medically unnecessary devices and procedures.  The Brazilian doctors purchased Defendants' devices and used them even though other companies' medical devices were better suited for the patient and/or were lower in price while providing the same or a superior benefit to the patient.

213.    If the Members had known about Defendants' payments of kickbacks and other secret financial payments to a particular medical provider, the Members would have refused to pay the amounts billed by that provider for Defendants' medical devices.

214.    Defendants' conduct was willful, wanton, malicious and oppressive.

215.    By reason of Defendants' conduct, the Members have suffered millions of dollars' worth of damage and continue to be damaged in an amount to be determined at trial.

216.    Accordingly, Plaintiff seeks an award of damages in compensation for, among other things, the millions of dollars that Defendants stole from the Members as a result of their fraudulent scheme.  Further, Plaintiff seeks the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.


**Count II**
**Fraud By Non-Disclosure – Vicarious Liability**

217.    Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

218.    Defendants directed secret payments, directly and through Brazilian distributors, to Brazilian medical professionals to increase their use of Defendants' medical devices and then oversaw those payments as they were made.

219.    Defendants directed and approved those payments as part of their sales and marketing responsibilities on behalf of Defendants.

220.    In furtherance of Defendants' scheme to make secret payments to Brazilian medical professionals, Defendants directly and through their Brazilian distributors, concealed the fact that they engaged in a widespread campaign of making secret payments to doctors in Brazil to induce those doctors to use Defendants' medical devices.

221.    In furtherance of Defendants' scheme to make secret payments to Brazilian medical professionals, Defendants directly and through their Brazilian distributors, concealed the fact that they offered Brazilian medical professionals, directly and through their Brazilian distributors, bribes and secret payments, which were intended to influence Brazilian doctors in order to retain their business.

222.    In furtherance of Defendants' scheme to make secret payments to Brazilian medical professionals, Defendants directly and through their Brazilian distributors, submitted false records, false statements, false invoices, and claims to medical providers for payment by third-party payers, including the Members.

223.    Defendants also used and directed other local Brazilian distributors, as well as their employees, agents, representatives, distributors, contractors, subsidiaries and/or affiliates, to make or cause to be made the kickbacks and other secret financial inducements to medical providers to sell Defendants' products.

224.     Defendants' employees, agents, representatives, distributors, contractors, subsidiaries and/or affiliates were acting within the scope of their employment when they engaged in this conduct.

225.     Defendants' employees, agents, representatives, distributors, contractors, subsidiaries and/or affiliates were acting within the scope of their actual or apparent authority when they engaged in this conduct.

226.     Defendants also used local Brazilian distributors, as well as their employees, agents, representatives, distributors, contractors, subsidiaries and/or affiliates, to make or cause to be made the kickbacks and other secret financial inducements to medical providers to sell Defendants' products.

227.     Defendants knew or should have known that their local distributors made these payments because Defendants exerted a high level of control and oversight over them.

228.     Defendants failed to stop the secret kickbacks made by their local distributors because Defendants were benefitting from the higher sales caused by these secret payments.

229.     As set forth above, given the secret nature of the kickback and bribery scheme that Defendants had put in place and concealed from the Plaintiff and the Members, they were unaware of the scope of Defendants' conduct, until the Brazilian media and government uncovered the extent of the bribery.

230.     Defendants' schemes of secret payments to Brazilian medical providers was material because they were an attempt to affect, and actually did affect, the amounts that were billed to the Members and the amounts that the Members were obligated to pay and did pay.

231.     The failure to disclose the payment of bribes and other secret financial payments to Brazilian medical providers was further material because the Members relied upon the honest

services of those medical providers when presented with invoices to pay for what the Members believed were medically necessary products and procedures.

232.    The Members reasonably relied on their belief that the doctors who had been bribed were acting in line with industry standards and ethics and that the invoices they provided only included charges for medically necessary products/surgeries and charged the actual amount for the devices implanted, and that those invoices were accurate and not the product of secret payments paid in furtherance of the fraudulent scheme.

233.    The scheme of secret payments has directly, legally and proximately caused and continues to cause injuries to the Members and their business or property.

234.    As a result of Defendants' ratification of and failure to stop the actions of their wholly-owned subsidiaries and local distributors, the Members vastly overpaid for medical products and procedures that were the result of the false and fraudulent invoices, and paid for invoiced claims that should never have been submitted.

235.    Defendants are vicariously liable for the payments of bribes, kickbacks, and other secret financial inducements carried out by their employees, agents, representatives, distributors, contractors, subsidiaries and/or affiliates.

236.    By reason of Defendants' conduct, the Members have suffered millions of dollars' worth of damage and continue to be damaged in an amount to be determined at trial.

237.    Accordingly, Plaintiff seeks an award of damages in compensation for, among other things, the millions of dollars that Defendants stole from the Members as a result of their fraudulent scheme.  Further, Plaintiff seeks the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.

**Count III**
**Common Law Fraud**

238.    Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

239.    Defendants made knowing or reckless misrepresentations about the price of Defendants' medical devices and products and concealed that invoiced prices included the cost of bribes and their fraudulent scheme.  Because the invoices did not state the true price of the product or device, or that they included the cost of bribes and other improper inducements, the invoices were false and fraudulent.

240.    The Members relied on the invoices that Defendants issued, or caused to be issued, and paid the amounts reflected on those invoices.

241.    The Members were injured by their reliance on the invoices Defendants issued, or caused to be issued, because they paid amounts for medical devices and products that exceeded what was actually charged by Defendants for those devices and products.

242.    The Members were injured by their reliance on the invoices Defendants issued, or caused to be issued, because the Members were forced to pay for the bribes that Defendants were directing towards Brazilian doctors.

243.    Defendants' scheme was intended to affect, and actually did affect, the amounts that were billed to the Members and the amounts that the Members were obligated to pay and did pay.

244.    For this reason, Defendants' scheme was material to the Members.

245.    Defendants' submission of false invoices was further material because the Members relied upon the honest services of those medical providers when presented with

invoices to pay for what the Members believed were medically necessary products and procedures.

246.    The Members reasonably relied on their belief that the doctors who had been bribed were acting in line with industry standards and ethics and that the invoices they provided only included charges for medically necessary products/surgeries and charged the actual amount for the devices implanted, and that those invoices were not the product of secret payments.

247.    Defendants' unlawful conduct has directly, legally and proximately caused and continues to cause injuries to the Members and their business or property.

248.    These injuries include the Members paying excessively high prices for devices and procedures, and for medically unnecessary devices and procedures.

249.    Defendants' misrepresentations were made knowingly and recklessly, with the intent to force the Members to pay amounts that the Members should not have been required to pay.

250.    Defendants intentionally concealed the kickbacks and other secret financial payments to mislead Brazilian health insurers, including the Members, into relying upon the veracity of medical bills and invoices presented to them for payment.

251.    Defendants were aware that the Plaintiff and the Members did not know of the secret payments and intended that the payments remained secret.

252.    Defendants intended that the Members not be aware of the secret payments Defendants were making.

253.    Given the secret nature of the kickback and bribery scheme effectuated through false invoices that Defendants had put in place and concealed from the Plaintiff and the

Members, the Plaintiff and Members could not have discovered until the Brazilian media and government uncovered the extent of said bribery.

254.     By reason of Defendants' conduct, the Members have suffered millions of dollars' worth of damage and continue to be damaged in an amount to be determined at trial.

255.     Accordingly, Plaintiff seeks an award of damages in compensation for, among other things, the millions of dollars that Defendants stole from the Members as a result of the fraudulent scheme.  Further, Plaintiff seeks the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.


**Count IV**
**Common Law Fraud – Vicarious Liability**

256.     Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

257.     Defendants directed and approved secret payments, directly and through their Brazilian distributors, to Brazilian medical professionals to increase their use of Defendants' medical devices and then oversaw those payments as they were made.

258.     Defendants directed those payments as part of Defendants' sales and marketing responsibilities on behalf of Defendants.

259.     Defendants directed their Brazilian distributors, to submit false records, false statements, false invoices, and claims to medical providers for payment by third-party payers, including the Members.

260.     In furtherance of Defendants' scheme to make secret payments to Brazilian medical professionals, Defendants directly and through their Brazilian distributors, made misrepresentations about the price of Defendants' medical devices and products. One of the ways

they did this was by issuing invoices that did not accurately reflect the prices charged for the devices and products set forth on those invoices.

261.   Defendants, directly and through their Brazilian distributors, caused misrepresentations to be made about the price of Defendants' medical devices and products by causing others to issue invoices that did not accurately reflect the prices charged for the devices and products set forth on those invoices.

262.   The prices reflected on these invoices were false in that the amounts set forth on the invoices did not match the amounts that were actually charged for the devices and products listed on the invoices.

263.   Defendants, directly and through their Brazilian distributors, issued, and caused to be issued, these invoices on a regular basis as part of the day-to-day operation of their business.

264.   These invoices were an integral part of Defendants' scheme to improperly interfere with the decisions that Brazilian doctors made in choosing which medical devices and products to use.

265.   Defendants knew or should have known the representations made in these invoices were false.

266.   Defendants, directly and through their Brazilian distributors, issued, and caused to be issued, these invoices with the intent that Brazilian doctors would submit the invoices to insurers, including Members, so that the doctors would be paid by the insurers at the higher rate reflected on the invoices and be able to keep the excess amount between what they actually paid for the device and the amount on the invoice.

267.   The excess amount the doctors were able to keep was the bribe Defendants paid to the doctors to induce their use of Defendants' medical devices and products.

268.    The Members relied on the invoices issued and paid the amounts reflected on those invoices.

269.    The Members were injured by their reliance on the invoices issued because they paid amounts for medical devices and products that exceeded what was actually charged by Defendants for those devices and products.

270.    The Members were injured by their reliance on the invoices issued, because the Members were forced to pay for the bribes that Defendants were directing towards Brazilian doctors.

271.    Defendants' knowing and reckless misrepresentations, directly and through their Brazilian distributors, were made with the intent to force the Members to pay amounts that the Members should not have been required to pay.

272.    By reason of Defendants' conduct, directly and through their Brazilian distributors, the Members have suffered millions of dollars' worth of damage and continue to be damaged in an amount to be determined at trial.

273.    Accordingly, Plaintiff seeks an award of damages in compensation for, among other things, the millions of dollars that Defendants stole from the Members as a result of their fraudulent scheme.  Further, Plaintiff seeks the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.


**Count V**
**Civil Conspiracy (Fraud)**

274.    Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

275.     Defendants entered into a confederation or combination with Brazilian distributors in order to accomplish the above enumerated fraudulent and deceitful scheme of making secret payments and providing secret benefits to doctors, to induce those doctors to use more of Defendants devices.

276.     Defendants and various medical device distributors then entered into yet another confederation or combination with various Brazilian medical providers wherein Defendants and those doctors and hospitals agreed the doctors would accept Defendants' secret payments and benefits by submitting false invoices to the Members with the understanding that they were in exchange for increasing their use of Defendants' medical products and devices.

277.     The objective of this concerted action by Defendants and their co-conspirators was to pay Brazilian doctors to increase their use of Defendants' medical products and devices in violation of applicable state and Federal law, Brazilian law and the Brazilian codes of medical ethics.

278.     To achieve the objects and purpose of the conspiracy and in furtherance of the conspiracy, Defendants and the co-conspirators used the following criminal or unlawful means and engaged in the following overt acts, among others:

   a.    Defendants directly and indirectly paid kickbacks and other secret financial inducements to Brazilian medical providers.

   b.    Local distributors engaged by Defendants to sell Defendants' products paid kickbacks and other secret financial inducements to Brazilian medical providers.

   c.    Defendants and the local distributors fraudulently concealed these kickbacks and secret payments and did not record such payments in their books and records.

   d.    It was a further part of the conspiracy that at the end of Defendants' fiscal year, their employees, agents, representatives, distributors, contractors, subsidiaries and/or affiliates falsely recorded the payments to conceal the

true nature of the payments in the consolidated books and records of Defendants.

e.  The Brazilian medical providers accepted kickbacks and other secret gifts, in exchange for purchasing unnecessary products from Defendants at artificially high prices.

f.  The Brazilian medical providers billed third-party payers, including the Members, for these unnecessary medical devices and medical procedures, which were the product of fraud.

279.  Defendants, directly and through their Brazilian distributors, made the contemplated secret payments and the Brazilian doctors accepted those payments.

280.  Defendants and their co-conspirators agreed to and entered into the aforesaid conspiracy with the objective and for the purpose of inducing Brazilian medical providers to purchase and use Defendants' products in exchange for Defendants paying the medical providers bribes, kickbacks, and other secret financial inducements and having the Members pay the false claims submitted for the medical devices, procedures and services. The goal of this fraud and deceit was to sell more devices and products in Brazil which were intended to be paid for by insurers, including the Members.

281.  This resulted in the overuse of Defendants' medical devices, as Defendants intended.

282.  It also resulted in a fraud against the Members.

283.  As a result of this conspiracy, Defendants sold more of their medical devices and certain medical providers profited from the kickbacks and other secret payments.

284.  The Members were forced to pay for Defendants' devices that were improperly prescribed and used.

285.  Defendants, medical providers, and the other co-conspirators did thereby profit and reap the benefit of the fraudulent acts and payments while the Members were billed and paid

millions of dollars of false and fraudulent claims, which the Members would not have paid had they known the truth of the bribes, kickbacks, and fraudulent financial inducements.

286.    As such, Defendants combined, conspired and agreed together with physicians, hospitals, distributors, and others to defraud third-party payers, including the Members.

287.    By reason of the conduct of Defendants and the other conspirators, the Members have suffered millions of dollars' worth of damage and continue to be damaged in an amount to be determined at trial.

288.    Accordingly, Plaintiff seeks an award of damages in compensation for, among other things, the millions of dollars that Defendants stole from the Members as a result of their fraudulent scheme.  Further, Plaintiff seeks the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.

## Count VI
## Tortious Interference With Contractual Relations

289.    Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

290.    The Members had valid business relationships, contractual relationships, policies, and contracts with their policy holders and medical providers.

291.    Defendants knew, or had reason to know of, these contracts and relationships between the Members and their policy holders and medical providers.

292.    Defendants intentionally interfered with these contracts and relationships.

293.    With knowledge of these contracts and relationships, and with the intent to interfere with these relationships, Defendants, directly and through Brazilian distributors, made or caused to be made bribes, kickbacks and other secret financial inducements to medical

providers, and knowingly induced false and fraudulent invoices and claims to be submitted to the Members, for payment, in breach of the policy holders' and medical providers' respective contractual obligations to submit only invoices for reasonably necessary medical expenses.

294. The bribes, kickbacks and other secret inducements that Defendants made without justification interfered with the Members' contractual relationships because they induced Brazilian doctors to violate ethical codes and the agreements they had with the Members.

295. The bribes, kickbacks and other secret inducements that Defendants made without justification interfered with the Members' contractual relationships in a way that increased the amounts that the Members were required to pay for Defendants' medical devices that were improperly used as a result of the corrupted decision making process Defendants induced.

296. As a direct and proximate result of Defendants' intentional tortious interference with the Members' contractual relationships with their policy holders and medical providers, the Members have been damaged and continue to be damaged by the increased amounts, running to millions of dollars, that the Members were required to pay as a result of the secret payments Defendants made or caused to be made.

297. As a result of Defendants' intentional tortious interference and conduct, Defendants benefitted through increased sales of their medical devices, leading to increased profits and receipt of higher revenue.

298. By reason of the conduct of Defendants and the other conspirators, the Members have suffered millions of dollars' worth of damage and continue to be damaged in an amount to be determined at trial.

299. Accordingly, Plaintiff seeks an award of damages in compensation for, among other things, the millions of dollars that Defendants stole from the Members as a result of their

fraudulent scheme.  Further, Plaintiff seeks the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.

## Count VII
### Tortious Interference – Vicarious Liability

300.    Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

301.    Defendants directed secret payments to Brazilian medical professionals to increase their use of Defendants' medical devices and then oversaw those payments as they were made.

302.    Defendants directed those payments as part of Defendants' sales and marketing responsibilities.

303.    The Members had valid business relationships, contractual relationships, policies, and contracts with their policy holders and medical providers.

304.    Defendants knew, or had reason to know of, these contracts and relationships between the Members and their policy holders and medical providers.

305.    Defendants intentionally interfered with these contracts and relationships.

306.    With knowledge of these contracts and relationships, and with the intent to interfere with these relationships, Defendants, directly and through their Brazilian distributors, made or caused to be made the bribes, kickbacks and other secret financial inducements to medical providers, and knowingly caused the false and fraudulent invoices and claims to be submitted to third-party payers, including the Members, for payment, in breach of the policy holders' and medical providers' respective contractual obligations to submit only invoices for reasonably necessary medical expenses.

307.   The bribes, kickbacks and other secret inducements that Defendants made without justification interfered with the Members' contractual relationships because they induced Brazilian doctors and hospitals to violate ethical codes and the agreements they had with the Members to make decisions to use Defendants' medical devices so that they themselves would profit.

308.   The bribes, kickbacks and other secret inducements that Defendants made without justification interfered with the Members' contractual relationships in a way that increased the amounts that the Members were required to pay for Defendants' medical devices that were improperly used as a result of the corrupted decision making process Defendants induced.

309.    As a direct and proximate result of Defendants tortious interference with the Members' contractual relationships with their policy holders and medical providers, the Members have been damaged and continue to be damaged by the increased amounts, running to millions of dollars, that the Members were required to pay as a result of the secret payments Defendants made or caused to be made.

310.   As a result of Defendants' tortious interference and conduct, Defendants benefitted through increased sales of their medical devices, leading to increased profits and receipt of higher revenue.

311.   Defendants are vicariously liable for the payments of bribes, kickbacks, and other secret financial inducements carried out by their employees, agents, representatives, distributors, contractors, subsidiaries and/or affiliates.

312.   By reason of Defendants' conduct, the Members have suffered millions of dollars' worth of damage and continue to be damaged in an amount to be determined at trial.

313.     Accordingly, Plaintiff seeks an award of damages in compensation for, among other things, the millions of dollars that Defendants stole from the Members as a result of their fraudulent scheme.  Further, Plaintiff seeks the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.

## Count VIII
### Civil Conspiracy (Tortious Interference with Contractual Relations)

314.     Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

315.     Each of the Defendants entered into a confederation or combination with various medical device distributors to accomplish the above enumerated scheme of making secret payments and providing secret benefits to doctors and hospital to induce those doctors and hospitals to use Defendants' devices at higher cost, more frequently, and often unnecessarily.

316.     Defendants, and various medical device distributors, entered into yet another confederation or combination with various Brazilian doctors wherein Defendants and those doctors agreed that the doctors would accept Defendants' secret payments and benefits in exchange for their use of Defendants' medical devices.

317.     The objective of this conspiracy was to pay Brazilian doctors to increase their use of Defendants' medical devices in violation of Brazilian law and the Brazilian codes of medical ethics.

318.     A further objective of this conspiracy was to interfere with valid business relationships, contractual relationships, policies, and contracts that the Members had with their policy holders and medical providers.

319.     Defendants knew, or had reason to know of, these contracts and relationships between the Members and their policy holders and medical providers.

320.     Defendants intentionally interfered with these contracts and relationships.

321.     With knowledge of the contractual relationships, and with the intent to interfere with these contractual relationships, Defendants made or caused to be made bribes, kickbacks and other secret financial inducements to medical providers, and knowingly induced false and fraudulent invoices and claims to be submitted to the Members for payment, in breach of the policy holders' and medical providers' respective contractual obligations to submit only invoices for reasonably necessary medical expenses.

322.     The bribes, kickbacks and other secret inducements that Defendants made without justification interfered with the Members' contractual relationships because they corrupted the way in which decisions to use Defendants' medical devices were made and, more importantly, increased the amounts that the Members were required to pay for Defendants' medical devices that were improperly used as a result of the corrupted decision making process.

323.      As a direct and proximate result of Defendants' tortious interference with the Members' contracts with their policy holders and medical providers, the Members have been damaged and continue to be damaged by the increased amounts, running to millions of dollars, that the Members were required to pay as a result of the secret payments Defendants made or caused to be made.

324.     As a result of Defendants' tortious interference and conduct, Defendants benefitted through increased sales of their medical devices, leading to increased profits and receipt of higher revenue.

325.    Accordingly, Plaintiff seeks an award of damages in compensation for, among other things, the millions of dollars that Defendants stole from the Members as a result of their fraudulent scheme.  Further, Plaintiff seeks the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.

## Count IX
## Negligent Misrepresentation

326.    Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

327.    Each of the Defendants had a duty to provide accurate information about the price of Defendants' medical devices and products.

328.    Notwithstanding such duty, Defendants made or caused to be made misrepresentations and provided false information to the Members.  This included, among other things, false statements and information regarding the price of Defendants' medical devices and products, including in the form of invoices that were provided by the Defendants, or on their behalves, to the Members or for payment by the Members.

329.    Defendants failed to exercise reasonable care in obtaining or communicating the information.

330.    Defendants' actions were intended to, and in fact did, induce the Members to pay for Defendants' medical devices and products.

331.    Indeed, the Members justifiably relied upon the Defendants' representations, including the invoices.

332.    As a result, the Members paid amounts for medical devices and products that exceeded what was actually charged by Defendants for those devices and products, and paid for

medical devices, products and procedures that the Members were caused to believe were medically necessary.

333.     This resulted in substantial pecuniary loss to the Members.

334.     By reason of Defendants' conduct, the Members have suffered millions of dollars' worth of damage, and continue to be damaged, in an amount to be determined at trial.

335.     Accordingly, Plaintiff seeks an award of damages in compensation for, among other things, the millions of dollars that Defendants stole from the Members as a result of the fraudulent scheme.  Further, Plaintiff seeks the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.


### Count X
### Unjust Enrichment

336.     Plaintiff restates, realleges and incorporates by reference all previous paragraphs.

337.     Defendants were unjustly enriched at Members' expense when they bribed Brazilian doctors to induce them to overuse Defendants' medical devices, or to use those devices when they were not necessary.

338.     Defendants were enriched by increasing the sale of their medical devices in Brazil as a result of their widespread campaign of bribing and paying secret financial inducements to Brazilian doctors to use Defendants' medical devices.

339.     This campaign resulted in the Members being obligated to pay for medical devices at an increased costs, as Defendants and various medical device distributors accomplished Defendants' scheme by issuing fraudulent invoices which the Members were obligated to pay.

340.    This campaign also resulted in widespread overuse of Defendants' medical devices and numerous instances of unnecessary use of the devices, which obligated the Members to pay for devices which should never have been implanted or used.

341.    Defendants' campaign had the intended effect and increased Defendants' device sales in Brazil.

342.    Defendants were enriched by the increased sale of their devices in Brazil.

343.    Defendants' enrichment came at the expense of the Members, who were obligated to pay for Defendants' products that the Brazilian doctors who received secret inducements used in patients insured by the Members.

344.    The profits that Defendants realized in Brazil are a direct result of their scheme to bribe Brazilian doctors and came at the expense of the Members, who were forced to pay for the increased use of Defendants' products at inflated costs that resulted from Defendants' bribery scheme, thereby resulting in damage to the Members.

345.    There was no justification for Defendants' actions other than improper self-enrichment at the Members' expense.

346.    It is against equity and good conscience to permit Defendants to retain the amounts that the Members paid as a result of Defendants' bribery scheme.

347.    Accordingly, Defendants were unjustly enriched in an amount to be determined at trial, but believed to run into millions of dollars.

## Count XI
## Injunctive Relief

348.   Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

349.   Abramge is an association whose membership is comprised of private group medical service providers, which provide health insurance in Brazil.

350.   Abramge is charged with ensuring the continued viability of private group medical service in Brazil by defending, representing, and educating its member insurers.

351.   Improper and fraudulent business practices undertaken by vendors that make it more expensive for Brazilian health insurance companies to operate damage the Members' businesses.

352.   The Members have legal standing to sue to prevent or correct improper activities that are damaging their businesses.

353.   Stopping market-wide illicit business practices that are damaging Brazilian private medical insurers is germane to Abramge's organizational purpose.

354.   As set forth above, Defendants have been engaged in a scheme of making secret, illicit payments to doctors and hospitals in Brazil to induce the use of Defendants' products and increase Defendants' market share in Brazil.

355.   Defendants' scheme resulted in the unnecessary use and over use of Defendants' products, unnecessary surgeries and medical services, the use of Defendants' products when other available products were equal or better medical choices and/or less expensive, and artificially inflated prices, for which all of Abramge's members were forced to pay.

356.   Defendants also inflated the prices of their products to include the cost of their fraudulent scheme.

357.   Defendants' scheme is ongoing and continuing. They engaged and are still engaging in their fraudulent scheme to increase their market share, the sales of their products, and their revenues.

358.    This means that Abramge's Members were and are forced not only to pay for unnecessary and overpriced devices, surgeries and services, but to pay for the financing of the very scheme that was being used to overcharge Abramge's Members.

359.   Defendants' illicit and harmful scheme, which negatively affects the financial condition of Abramge Members, interferes with the competitive advantages Abramge's Members would otherwise have in the marketplace.

360.   Defendants' scheme is also harming the public and patients by creating an environment where health care decisions are made not based on what is best for the patient but determined by the bribes and financial inducements paid by Defendants and then invoiced to the Members.

361.   The health care system is being irreparably damaged and health care costs are artificially raised. This cannot be remedied by mere monetary compensation.

362.   Allowing Defendants to continue their scheme would place an undue hardship on Abramge's Members, patients, and the public, and is against the public interest.

363.   There can be no question the balance of the equities favors the Abramge and its Members.

364.   An injunction will stop Defendants' fraud and protect against the impact Defendants' subversion of doctor's decision making has had on patients' health and lives.

365.   Defendants' bribery, kickbacks, and fraudulent scheme is not entitled to any equitable protection.

366.    As such, Abramge seeks an injunction: (1) enjoining Defendants from engaging in their fraudulent acts, practices and scheme complained herein; and (2) ordering Defendants to cease their bribery, kickbacks, and other fraudulent financial incentives to doctors and hospitals to induce them to order and use Defendants' products.

WHEREFORE, Abramge requests judgment in its favor as follows:

A.    Awarding compensatory damages and punitive damages in an amount to be determined at trial;

B.    Entering a permanent injunction (1) enjoining Defendants from engaging in the fraudulent acts, practices and scheme complained herein; and (2) ordering Defendants to cease their bribery, kickbacks, and other fraudulent financial incentives to doctors and hospitals to induce them to order and use Defendants' products;

C.    Awarding legal fees and related expenses Abramge incurred and continue to incur in this action;

D.    Awarding the costs of this action; and

E.    Granting such other relief as the Court may deem just and proper.

ASHBY & GEDDES, P.A.

*/s/ Karen B. Skomorucha Owens*
Karen B. Skomorucha Owens (#4759)
F. Troupe Mickler IV (#5361)

*Of Counsel:*

LOCKE LORD LLP
Robert A. Romano
William G. Primps
R. James DeRose, III
Jeffrey Kramer
200 Vesey Street, 20th Floor
New York, New York 10281
(212) 415-8600
rromano@lockelord.com
william.primps@lockelord.com
rderose@lockelord.com
jkramer@lockelord.com

500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
kowens@ashby-geddes.com
tmickler@ashby-geddes.com

*Attorneys for Associação Brasileira de Medicina de Grupo*

Dated: December 14, 2016